A. Frederick GREENBERG; Richard M. GREENBERG, Petitioners,

v.

The BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, Respondent.

No. 1487, Docket 91–4200.

United States Court of Appeals, Second Circuit.

Argued April 22, 1992.

Decided June 19, 1992.

Peter I. Livingston, (Michelle J. D'Arcambal, Ross & Hardies, New York City, of counsel), for petitioners.

Douglas B. Jordan, Sr. Atty., Bd. of Governors of the Federal Reserve System, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., James V. Mattingly, Jr., General Counsel, Richard M. Ashton, Associate General Counsel, Board of Governors, Federal Reserve System, of counsel), for respondent.

Before: OAKES, Chief Judge, KEARSE and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Richard M. Greenberg and A. Frederick Greenberg ("the Greenbergs") petition for review of a decision of the Board of Governors of the Federal Reserve System ("the Board") barring the Greenbergs from further participation in the affairs of any federally supervised financial institution. The Greenbergs contend that bias tainted the administrative proceedings leading up to the Board's decision, that settlements reached with the Office of the Comptroller of the Currency (OCC) bar this enforcement proceeding, and that the Board erred in finding the Greenbergs' personally culpable. We affirm the Board's order of prohibition in all respects.

*Background*

This case arises out of the failure of the First City National Bank and Trust Company (the Bank) in 1989. The Greenbergs were members of the board of the Bank, served on the Bank's loan committee, and each owned at least 40% of the common stock of the Bank. A. Frederick Greenberg served as the Chairman of the Board, while Richard Greenberg assumed the role of acting Chairman in Frederick's absence.

On October 11, 1986, the Bank converted from a savings bank to a national banking association, placing the Bank under the supervisory authority of the OCC. Between the conversion in 1986 and the Bank's insolvency in 1989, the OCC raised numerous questions about the Bank's practices, focusing in particular on a series of transactions between the Bank and certain limited partnerships controlled or managed by the Greenbergs.

After the Bank failed, the OCC instituted a prohibition proceeding against the Greenbergs in March of 1990 based largely on these insider loans. That proceeding culminated in a hearing before an Administrative Law Judge (ALJ) in November of 1990, and the ALJ issued a lengthy recommended opinion concluding that the Greenbergs had engaged in several impermissible transactions and that this misconduct warranted barring the Greenbergs from the banking industry.

The Greenbergs filed objections to the recommended decision with the Board. After careful consideration, the Board rejected these objections, adopted with minor modifications the recommendations of the ALJ, and issued an order of prohibition barring the Greenbergs from the industry. This petition for review followed.

*Discussion*

The Greenbergs raise three principal issues on this petition for review. First, they argue that the ALJ's employment of a law clerk who had previously worked on the OCC's investigation of the Greenbergs irreparably tainted the proceedings. Second, they assert that prior settlements with the OCC bar this prohibition proceeding. Finally, they question whether substantial evidence in the record supported the Board's finding of misconduct.

1. The Law Clerk

█ Shortly before the trial, the Greenbergs' counsel discovered that the ALJ's former law clerk had previously worked for the OCC and had participated in that agency's investigation of the Greenbergs. The Greenbergs thereupon requested that the ALJ recuse himself. The ALJ refused to do so. The ALJ explained that he had not known that the law clerk had previously participated in the Greenberg investigation and noted that the law clerk had worked for the judge for only six weeks "during the course of which he did some administrative things for me with regard to this case, but he had no substantive input." The ALJ assured the Greenbergs that the law clerk "ha[d] not said to me one word concerning any previous involvement in this case, nor said anything about the bank or the people involved." Accordingly, the ALJ concluded that there was no need to recuse himself. The Greenbergs did not investigate the matter further. On this petition for review, however, the Greenbergs assert that the participation by the ALJ's law clerk in the underlying investigation biased the entire administrative proceeding.

█ The Greenbergs acknowledge that they have no evidence that the law clerk

improperly influenced the ALJ. Instead, they argue that the mere appearance of impropriety is sufficient to require the ALJ to recuse himself. Had this case been tried before a federal district judge, this might be a plausible argument. Under 28 U.S.C. § 455(a), a federal judge must recuse herself "in any proceeding in which [her] impartiality might reasonably be questioned." That high standard of propriety applies, however, only to Supreme Court justices, magistrate judges, and "judges of the courts of appeals, district courts, Court of International Trade and any court created by Act of Congress, the judges of which are entitled to hold office during good behavior." 28 U.S.C. § 451. The heightened standard cannot apply to administrative law judges who, after all, are employed by the agency whose actions they review. Otherwise, ALJs would be forced to recuse themselves in every case.

Instead, we think the Greenbergs' charge must be judged under the standards imposed on ALJs by the Administrative Procedure Act (APA), 5 U.S.C. § 554(d). That section requires that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision...."

■ The APA is violated only where an individual actually participates in a single case as both a prosecutor and an adjudicator. Ministerial participation in one function will not disqualify the actor from more substantial participation in the other function. *See Finer Foods Sales Co., Inc. v. Block,* 708 F.2d 774, 779 (D.C.Cir.1983) (signing a reparations order a ministerial act, not the performance of a prosecutorial function, since signing "did not require the Judicial Officer to exercise any discretion or make any legal or factual judgments."); *Shultz v. Securities and Exchange Com'n,* 614 F.2d 561, 569 (7th Cir.1980) (no violation of APA where the agency prosecutor drafted the notice of decision for the agency, because the decision had been made by judges without any input from the prosecutor).

The uncontroverted facts in this case lead to the conclusion that the law clerk played only a ministerial role in the adjudicatory process. The ALJ stated that the law clerk had not spoken to the ALJ about the underlying investigation and had performed only administrative tasks in the case. The Greenbergs had the burden of establishing that the law clerk played a more significant role in the decision. *See Grolier Inc. v. FTC,* 615 F.2d 1215, 1221 (9th Cir.1980). The Greenbergs failed to present any facts that would contradict the ALJ's version of events. Indeed, the record does not indicate that the Greenbergs even attempted to depose the law clerk. Since the ALJ's version remains effectively unchallenged, we hold that there was no violation of the APA.

■ As a final resort, the Greenbergs assert that the law clerk's participation in both the adjudicative and prosecutorial processes created such a risk of an unfair decision as to violate due process. We agree that a due process violation may be established without a showing of actual bias where "a court ... determin[es] from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high." *Withrow v. Larkin,* 421 U.S. 35, 58, 95 S.Ct. 1456, 1470, 43 L.Ed.2d 712 (1975). However, the simple "combination of investigative and adjudicative functions does not, without more, constitute a due process violation." *Id.*

In *Withrow,* the Court approved an arrangement whereby the state medical board both brought and adjudicated charges against wayward physicians. The Court reasoned that the adjudicators were entitled to a presumption of honesty. *Id.* at 47, 95 S.Ct. at 1464. Absent specific evidence to the contrary, the Court was confident that the mixture of functions would not create "a sufficiently great possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position." *Id.* at 57, 95 S.Ct. at 1469. Here, where the former prosecutor (the law clerk) had no decisional

authority, but at most might have advised the decision maker, the risk of impropriety was not as high as that tolerated by the Court in *Withrow.* Accordingly, we reject the Greenbergs' due process challenge.

In sum, while we recognize that law clerks occasionally play more than a ministerial role in the decision making process, the uncontroverted record establishes that this law clerk did not. Accordingly, the law clerk's prior association with the prosecuting agency does not undermine our confidence in the fairness of the proceedings.

### 2. Res Judicata

The Greenbergs argue that prior OCC enforcement actions against them and the Bank bar this removal action. This claim has been before us once before. In *Greenberg v. Comptroller of the Currency,* 938 F.2d 8 (2d Cir.1991), the Greenbergs sought to enjoin the OCC action that resulted in the orders of prohibition at issue here. As one ground of attack, the Greenbergs asserted the preclusive effect of the prior enforcement proceedings. We declined to entertain the claim then, reasoning that the better course was to await the outcome of the OCC investigation, since "a judicial determination as to whether any issues in the current OCC proceedings have been settled in prior proceedings would require a comparison of the facts and transactions underlying both the prior and the current proceedings, a comparison that best can be made in the first instance by the OCC itself." *Id.* at 12. The OCC has now made that comparison. In the opinion recommending an order of prohibition, the ALJ ruled that "[n]one of the violations alleged here were at issue in the prior cases." We agree with the ALJ's conclusions, and therefore reject the Greenbergs' preclusion claim.

■■■ The doctrine of res judicata, or claim preclusion, provides that a final judgment on the merits in one action bars subsequent relitigation of the same claim by the same parties and by those in privity with the parties. *N.L.R.B. v. United Technologies Corp.,* 706 F.2d 1254, 1259 (2d Cir.1983). That bar extends both to "is-

sues actually decided in determining the claim asserted in the first action and [to] issues that could have been raised in the adjudication of that claim." *Id.* at 1259. However, preclusion is limited to the transaction at issue in the first action. Litigation over other transactions, though involving the same parties and similar facts and legal issues, is not precluded. *Id.* at 1259–60.

■■■ Res judicata applies to judgments by courts and by administrative agencies acting in an adjudicative capacity. *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Settlements may also have preclusive effect. *May v. Parker–Abbott Transfer and Storage Inc.,* 899 F.2d 1007, 1009 (10th Cir.1990). The preclusive effect of a settlement is measured by the intent of the parties to the settlement. *Id.* at 1010–11.

With these principles in mind, we examine carefully the prior actions between the OCC and the Greenbergs to determine whether any of them concerned transactions that formed the basis of the order of prohibition. There are three different settlement actions at issue here, a letter of reprimand issued to the Greenbergs in 1988, civil money penalties assessed against the Greenbergs in 1989, and a settlement with the Bank reached in 1988 and amended in 1989.

#### a. The Letter of Reprimand

■■■ The OCC issued a letter of reprimand to the Greenbergs dated June 15, 1988. That letter followed a March 19, 1987 letter informing the Greenbergs that the OCC was considering whether to assess civil money penalties based on violations of lending limit rules in several transactions, including one (the purchase of loans extended by Fidelity Funding, Inc. (FFI) to borrowers who used the funds to invest in limited partnerships in which the Greenbergs were general partners) that is at issue in this proceeding. In the letter of reprimand, the OCC informed the Greenbergs that "the Comptroller has determined not to assess penalties based upon

these violations." The Greenbergs contend that this decision bars the OCC from considering the FFI transaction in this prohibition proceeding.

There are two flaws in this argument. First, to the extent that the June 15 letter should be treated as a settlement, it can only have the preclusive affect that the parties to the settlement intended to give it. *See May*, 899 F.2d at 1010–11; *United States v. Burns*, 512 F.Supp. 916, 921 (W.D.Pa.1981). The June 15 letter states that "this decision does not affect further possible administrative action...." Thus, the parties intended that the letter have *no* preclusive affect. Second, to the extent we consider the letter a unilateral ruling by the OCC, such unilateral administrative action has no res judicata affect. *See International Harvester Co. v. OSHRC*, 628 F.2d 982, 984–86 (7th Cir.1980). Accordingly, the letter of reprimand does not bar this prohibition proceeding.

### b. The Civil Money Penalty

■ The Greenbergs also point to certain civil money penalties that the OCC assessed and simultaneously suspended on May 23, 1989. The penalties imposed in that proceeding related to four transactions which, though functionally similar to several of the transactions at issue here, involved loans to different parties. The Greenbergs nonetheless assert that the assessment is preclusive because the investigation which ultimately culminated in the assessment examined loans to Auto I, a limited partnership in which the Greenbergs were general partners, and those loans are also at issue here.

The Greenbergs point to a letter sent to their counsel by the OCC that accompanied the Notice of Assessment of a Civil Money Penalty. The letter stated that "the OCC has agreed to suspend and remit the instant civil money penalties, and further, has explicitly agreed that the proceedings initiated by these Notices would be considered settled." From this, the Greenbergs argue that the parties intended that the settlement encompass all the transactions investigated in the civil money penal-

ty proceedings, not simply those actually settled in the Notices.

A careful examination of the letter belies this claim. The letter consistently uses the word "Notices" to refer to the Notice of Assessment of a Civil Money Penalty. The only proceedings initiated by that Notice relate to the four transactions considered within it, not all the other transactions investigated along the way. Accordingly, those are the only transactions settled by the assessment of civil money penalties. Since none of those transactions are at issue here, we decline to give the 1989 civil money penalty proceeding the expansive preclusive affect that the Greenbergs seek.

### c. The Settlement with the Bank

■ Finally, the Greenbergs point to a settlement entered into by the OCC and the bank on August 10, 1988, and amended on May 31, 1989, in which the Bank agreed to cease and desist from loaning money to limited partnerships controlled by the Greenbergs. The August 10 consent order clearly does not preclude this action. That order contained a paragraph expressly reserving the right of the OCC to "undertake *any* action affecting the B[ank]" (emphasis added) and providing that "nothing in this [order] shall in any way inhibit, stop, bar, or otherwise prevent the [comptroller] from so doing."

The May 31, 1989 amendments to the settlement cloud the picture somewhat. Those amendments require the OCC to "dismiss *with prejudice* the Notice of Charges dated August 4, 1988, the Amended Notice of Charges dated February 21, 1989, and the Second Amended Notice of Charges dated March 10, 1989." (emphasis added). A stipulation and consent order accompanying the amendments reserved the OCC's right to take "any *other* action affecting the Bank." (emphasis added). The combination of the phrase "dismiss with prejudice" with the change from reserving the right to take "any action" to the right to take "any other action" suggests that the parties intended the amended settlement to preclude further litigation between the Bank and the OCC over the

transactions considered in the three identified notices of charges. To the extent that the transactions at issue in these three notices are also at issue here, the Greenbergs would have a credible preclusion argument. The only remaining question would be whether the Greenbergs are entitled to assert the preclusive affect of the OCC's settlement with the Bank.

We need not reach this question, however, because the Greenbergs have not demonstrated that any transaction included in the notices are also at issue here. Since the Greenbergs bear the burden of establishing res judicata, *American Fed. of Gov't Employees, Council 214, AFL–CIO v. Federal Labor Relations Authority*, 835 F.2d 1458, 1463 (D.C.Cir.1987), their failure to precisely identify which transactions considered here were also the subject of the 1988 settlement defeats their res judicata claim. Accordingly, we conclude that the Board properly determined that the prior enforcement actions did not bar this prohibition proceeding.

### 3. Merits

The Greenbergs also challenge the Board's decision on the merits. Under 12 U.S.C. § 1818, the OCC may seek an order prohibiting a person affiliated with a regulated bank from participating in the banking industry upon a showing that the person (1) committed a violation; (2) that the violation caused either losses to the bank or financial gain to the perpetrator; and (3) that the violation involved either personal dishonesty or willful or continuing disregard for the safety and soundness of the bank. *Id.* § 1818(e)(1).

The Board found that the Greenbergs violated restrictions on loans to affiliates and on insider loans by making loans to limited partnerships controlled by the Greenbergs. The Board then concluded that the Greenbergs benefitted from these transactions by gaining the use of funds for partnerships within their control. Finally, the Board found personal dishonesty in the Greenbergs willful failure to disclose to the Bank the Greenbergs' interests in several of the limited partnerships receiv-

ing loans. Our review of the factual determinations of the Board is limited to examining whether the findings are supported by substantial evidence. 5 U.S.C. § 706(2)(E). We review the legal determinations *de novo*.

The Greenbergs raise two principal objections to the Board's determinations. First, they contend that certain limited partnerships were improperly determined to be affiliates of the Bank and related interests of the Greenbergs and that loans to those partnerships should not have been counted as insider or affiliate transactions. Second, the Greenbergs contend that the evidence did not support the Board's finding of culpability. The Greenbergs do not contest the Board's finding that the Greenbergs profited from the challenged transactions.

■ As to the partnerships, 12 U.S.C. § 371c(b)(1) defines an affiliate of a bank to include any company controlled by the individuals who also control the bank. § 371c(b)(1)(C)(i). The Greenbergs acknowledge that they control the bank. They deny, however, control over certain limited partnerships for which they were the general partners but owned only a small equity stake in the partnership.

Section 371c(b)(3)(A) defines control to include ownership of "25[%] or more of any class of voting securities" of a company. The Board concluded that as the general partners of a limited partnership, the Greenbergs were in a position analogous to the sole owners of a class of securities within the limited partnership. Accordingly, the Board found that the Greenbergs controlled the limited partnerships, even though they owned only a small stake in these partnerships.

We agree with the Board's reasoning. The Greenbergs cannot deny that as general partners they controlled the day to day business of the limited partnerships. It would be elevating form over substance to assert that loans to these partnerships were not loans to entities controlled by the Greenbergs. Accordingly, we reject the Greenbergs' effort to overturn the Board's ruling on this ground.

The Greenbergs also assert that the record does not support the Board's determination of personal dishonesty. More than substantial evidence exists to support the Board's conclusion to the contrary. The Board found that the Greenbergs had not revealed several of the insider transactions to the directors of the bank. The record provides ample support for this conclusion. Minutes of the directors meetings are silent on the relationship between the Greenbergs and the limited partnerships that received loans. *Cum tacent, clamant.* (With apologies to Cicero, literally "With silence, they shout.") The Board and the ALJ were well within their discretion in rejecting the Greenbergs' self-serving testimony to the contrary. Accordingly, we reject the Greenbergs' claim that there was insufficient evidence to support a finding of culpability.

*Conclusion*

We have considered the remainder of the Greenbergs' objections and find them to be without merit. Accordingly, the order of prohibition issued by the Board is affirmed in all respects.

Affirmed.